# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IRENE KENDRELL, PERSONAL REPRESENTATIVE OF THE ESTATE OF ANTHONY KENDRELL, | CIVIL ACTION |
| Plaintiff, | No. 17-229 |
| v. | |
| JIM MATTIS, SECRETARY OF THE U.S. DEPARTMENT OF DEFENSE, | |
| Defendant. | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**　　　　　　　　　　　　　　　　　　　**JUNE 19, 2018**

      Plaintiff Irene Kendrell ("Ms. Kendrell") filed this action as the Personal Representative of the Estate of Anthony Kendrell against Defendant Jim Mattis, the Secretary of the United States Department of Defense ("Government") alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12101 *et seq.*, ADA Retaliation, 42 U.S.C.A. §12203(a), and the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5-12.

      On or around September 21, 2016, Ms. Kendrell filed a Complaint on behalf the estate of her son, Anthony Kendrell, in the United States District Court for the District of New Jersey. (Doc. No. 1.) On January 13, 2017, the case was transferred to this Court. (*Id.*) In her Complaint, Ms. Kendrell alleges that the Government harassed, discriminated, and retaliated against Anthony Kendrell in violation of the ADA and the New Jersey Law Against Discrimination. (Compl. ¶¶ 33–42.) Ms. Kendrell alleges that, as a result of the Government's actions, Anthony Kendrell took his own life on May 23, 2015. (*Id.* ¶ 30.) A settlement

agreement was reached between the Government and Ms. Kendrell's attorneys, Mr. Matthew Weisberg ("Mr. Weisberg") and Mr. Anthony DiJiacomo ("Mr. DiJiacomo"), on February 22, 2018. However, Ms. Kendrell refused to sign it because, in her opinion, it was "completely different" from what she had authorized her attorneys to enter. (Tr. 5/15/2018, 6–8.)

On April 4, 2018, the Government filed a Motion to Enforce Settlement Agreement against Ms. Kendrell. This Court entered an Order dated April 17, 2018 granting the Government's Motion. On April 19, 2018, Ms. Kendrell filed an Emergency Motion, *pro se*, requesting a hearing on the Motion to Enforce Settlement Agreement.[1] An evidentiary hearing was held on May 15, 2018, in which testimony was heard from Ms. Kendrell, Mr. Weisberg, and Mr. DiJiacomo.

The issue presently before the Court is whether the parties entered into a valid settlement agreement. After hearing the testimony and considering the evidence presented, the Court makes the following findings of fact.

## I. FINDINGS OF FACT

1. Ms. Kendrell, in her capacity as the personal representative of the Estate of Anthony Kendrell, was represented by Mr. Weisberg and Mr. DiJiacomo in a lawsuit against the Government. Tr. 5/15/2018, 5–6, 11, 13.

2. Settlement negotiations began in October 2017. *Id.* at 6, 14–15. Mr. DiJiacomo asked Ms. Kendrell what she was willing to accept to settle the case. Ms. Kendrell said that

---

[1] An evidentiary hearing was held on April 25, 2018 to determine whether Ms. Kendrell could proceed on behalf of the Estate of Anthony Kendrell without the assistance of counsel. Federal law permits a party to pursue all relief available to her without representation of counsel, but a non-attorney party may not seek relief on behalf of anyone other than herself. *Johnson v. Marberry*, 549 F. App'x 73, 75 (3d Cir. 2013) (citing 28 U.S.C. § 1654). Estate administrators do not act on behalf of themselves, but rather on behalf of the estate beneficiaries. However, a non-attorney estate administrator may proceed *pro se* if she is the sole beneficiary of the estate. *See Malone v. Nielson*, 474 F.3d 934, 936–37 (7th Cir. 2007) (per curiam). Here, Ms. Kendrell is acting on behalf of the beneficiaries of the Estate of Anthony Kendrell. Ms. Kendrell stated that she is the sole beneficiary of the Estate of Anthony Kendrell. Consequently, we found that Ms. Kendrell could proceed in this matter *pro se*.

given a choice between monetary compensation or injunctive relief, she would choose injunctive relief. *Id.*

3. The injunctive relief, or "changes," that Ms. Kendrell wanted included requiring the Government to put up signs detailing the rights of employees with disabilities, as well as provide reasonable accommodations where required under the ADA. *Id.* at 7.

4. Mr. DiJiacomo confirmed the settlement parameters with Ms. Kendrell in an email dated October 17, 2017. *Id.* 15–16; Gov't Ex. 1. The email stated,

> [Y]ou provided us authorization to settle this matter, to obtain the best possible settlement in our professional judgment that would include a provision requiring [the Government] to publicize at its offices (as an appropriate signage) that individuals with mental health disabilities have a right to accommodations along with contact information for the appropriate office, and that would also compensate us for our attorney fees.

Tr. 5/15/2018, 16; Gov't Ex. 1.

5. Mr. DiJiacomo opened settlement discussions with the Government by sending an email to opposing counsel, Assistant United States Attorney Scott Reid ("AUSA Reid"), on October 18, 2017, detailing Ms. Kendrell's framework. Tr. 5/15/2018, 18–20; Gov't Ex. 2.

6. Mr. DiJiacomo had a subsequent phone call with Ms. Kendrell where she confirmed authorization to settle the matter and mentioned an additional interest in contacting the Office of Personnel Management ("OPM") to request that they investigate why her son had not received reasonable accommodations themselves. Tr. 5/15/2018, 23. Following this phone call, Mr. DiJiacomo confirmed, in an email dated November 13, 2017, that Ms. Kendrell had provided "authorization to settle this matter with [the Government] in exchange for $5,000 in attorney's fees and [the Government] placing signs throughout its offices clearly stating that employees with mental health disabilities have the right to reasonable accommodations, along

3

with appropriate information for assistance." Gov't Ex. 4, at 1. The email also included a reference to Ms. Kendrell's desire to pursue information regarding the Government's failure to provide reasonable accommodations to her son through OPM. *Id.*

7. Ms. Kendrell emailed Mr. DiJiacomo on November 18, 2017 regarding a proposed settlement offer:

> I don't understand how this happened. When you asked me if I would accept $25,000 or changes, of the two, I said changes. However, after giving it a little thought, I text[ed] you and said why not both? Then I researched more and found out more information. So no, I will only accept this if I don't have another choice. . . . If I have to accept this offer, can I remove the complaint and refile a new one? This offer doesn't do anything. By law they had to already have this information given to [persons] with disabilit[ies]. So they aren't being held accountable for their illegal actions that destroyed my son.

Tr. 5/15/2018, 26; Gov't Ex. 4, at 2.

8. In a subsequent email dated November 20, 2017, Ms. Kendrell refused a request to schedule a phone call with Mr. DiJiacomo on the grounds that she "totally disagree[d] with [his] offer" and that she would no longer work with him. Tr. 5/15/2018, 27–28; Gov't Ex. 4, at 3.

9. Mr. DiJiacomo forwarded Ms. Kendrell's email to Mr. Weisberg. Tr. 5/15/2018, 27–28. Mr. Weisberg scheduled an in-person meeting with Ms. Kendrell. *Id.* at 28–29. Mr. DiJiacomo did not communicate with Ms. Kendrell again until February 2018. *Id.* at 31.

10. On February 22, 2018, Mr. Weisberg sent Ms. Kendrell an email asking for her authority to withdraw her claim in her separate legal malpractice matter that Weisberg Law was handling on her behalf and her authority to settle this present case against the Government "for whatever [they could] get." *Id.* at 45. It was Mr. Weisberg's opinion that neither of her cases would produce a favorable result. *Id.*; Gov't Ex. 6, at 1.

4

11. Ms. Kendrell replied, "That's fine . . . . That's the main thing [I] always wanted[, for] them [to be held] accountable for the lack of [reasonable accommodations given to Anthony Kendrell]. [I] will pursue it through OPM as soon as [you] tell me [I] can." Tr. 5/15/18; 46; Gov't Ex. 6, at 1. A brief email exchange ensued where Ms. Kendrell asked Mr. Weisberg for a "box of information" [containing discovery conducted thus far in the course of the case] so that she could send it to OPM to "make sure there will be changes." Gov't Ex. 6, at 2.

12. On February 22, 2018, Mr. Weisberg emailed AUSA Reid, informing him that he had Ms. Kendrell's authority to settle this matter and asked for the Government's best offer. Tr. 5/15/2018, 47–48; Gov't Ex. 7, at 3. AUSA Reid replied with an offer of $7,500 and no other considerations from the Government (the "Settlement Agreement"). Tr. 5/15/2018, 48–49; Gov't Ex. 7, at 1–2. Mr. Weisberg accepted the offer. Tr. 5/15/2018, 49.

13. On or about February 26, 2018, Mr. DiJiacomo spoke with Ms. Kendrell. Tr. 5/15/2018, 30–31; Gov't Ex. 5. Mr. DiJiacomo memorialized the conversation in an email he sent to Ms. Kendrell, in which he confirmed that she had granted he and Mr. Weisberg authorization to settle the matter against the Government. Tr. 5/15/2018, 31; Gov't Ex. 5.

14. Ms. Kendrell responded on February 27, 2018. Tr. 5/15/2018, 32; Gov't Ex. 5. Ms. Kendrell said, "Yes [I] agree to settle with the offer you feel is best, [h]owever [I] still think they should do more so more people can be helped. [I] will go forward in another matter to [e]nsure they do as they are required to do for the [disabled personnel] in government . . . ." Gov't Ex. 5.

15. On March 4, 2018, Ms. Kendrell sent an email to Mr. Weisberg. Tr. 5/15/2018, 51–52; Gov't Ex. 6, at 7. The email, which was under the subject "Thank you," said,

> Good morning [Mr. Weisberg]. [I] would like to thank you, [Mr. DiJiacomo], and David for the work you did[.] I am sure you all

> did the [best] that could be done, I hope you don't think [I] want the paperwork for another attorney to work on Anthonys [sic]. I know they couldn't do any better than you. I want to send anything that will help the disabled in government get what they need to perform. I am sending the info to anyone it can help. My only object is to have as many people's lives get better because of Anthony's death. Had there been a money settlement it all would go to help people's lives. I don't want or need anything in that way. . . . Thanks again and God Bless, Irene.

Gov't Ex. 6, at 7.

16. Upon receiving the final Settlement Agreement for review, Ms. Kendrell informed Mr. DiJiacomo and Mr. Weisberg that she would not sign it. Tr. 5/15/2018, 7–8. In Ms. Kendrell's opinion, the Settlement Agreement was "totally different" than what her attorneys had described. *Id.* at 8. The Settlement Agreement did not contain any concessions by the Government to put up signs or make changes. *Id.* at 7. According to Ms. Kendrell, the Settlement Agreement also precluded her from contacting OPM to launch a separate investigation into the incident. *Id.*

## II. LEGAL STANDARD

When deciding a motion to enforce settlement agreement, the court should apply the same standards as deciding a motion for summary judgment. *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991). "The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same — both deprive a party of his right to be heard in the litigation." *Id.* Courts may grant a motion to enforce settlement agreement where there is no dispute of material fact concerning the existence of a valid settlement agreement. *Id.* (citing *Erie Telecomm., Inc. v. City of Erie*, 853 F.2d 1084, 1093 (1988)).

6

However, if a dispute of material fact is present, the United States Court of Appeals for the Third Circuit has held that "when relief from a judgment hinges upon a factual issue and credibility determinations are involved, a hearing should be held to determine entitlement to relief." *Garabedian v. Allstates Eng'g Co.*, 811 F.2d 802, 803 (3d Cir. 1987) (citing *Fed. Deposit Ins. Corp. v. Alker*, 234 F.2d 113, 117 (3d Cir. 1956)). The party moving to enforce the settlement has the burden to show the existence of a valid contract and that the opposing party expressly granted authority to her attorney to enter into the contract. *Lakkis v. Lahovski*, 3:12-CV-1024, 2016 WL 4059672, at *3 (M.D. Pa. July 27, 2016).

Courts must determine whether both parties mutually entered into a valid settlement agreement. *Main Line Theatres, Inc. v. Paramount Film Distrib. Corp.*, 298 F.2d 801, 803 (3d Cir. 1962). "Settlement agreements are contracts between the parties and contract principles are generally applicable to their construction." *Wyndmoor Learning Ctr. v. City of Wilmington*, No. 93-4217, 1996 WL 117471, at *6 (quoting *Marine Midland Realty Credit Corp. v. LLMD of Mich., Inc.*, 821 F. Supp. 370, 373 (E.D. Pa. 1993)). An agreement "is binding upon the parties whether or not it is made in the presence of the court and whether or not it is made in writing." *Id.* (quoting *Green v. John H. Lewis & Co.*, 463 F.2d 389, 390 (3d Cir. 1970)). A court will not vacate, modify, or strike a dismissal under Local Rule of Civil Procedure 41.1(b) because a party has had a "change of heart." *Id.* at *7 (citing *Capital Controls Co. v. Aetna Cas. & Sur. Co.*, No. 88-7175, 1989 WL 167396, at *2 (E.D. Pa. Aug. 2, 1989)).

## III. DISCUSSION

On February 22, 2018, the Government entered into settlement discussions with Mr. Weisberg that ultimately resulted in a settlement agreement for $7,500 and no additional considerations from the Government. (Def.'s Mot. to Enforce Settlement, at 3.) However, after

7

reviewing the final agreement, Ms. Kendrell refused to sign it. (*Id.* at 3–4.) In her opinion, the Settlement Agreement was "not the agreement" that she had authorized her attorneys to enter because it precluded her from any injunctive relief and from pursuing her case through other avenues. (Pl.'s Emergency Mot. to Req. Hr'g; Tr. 5/15/2018, 6–8.) An evidentiary hearing was scheduled for May 15, 2018.

At the evidentiary hearing, this Court heard testimony from Ms. Kendrell, Mr. Weisberg, and Mr. DiJiacomo regarding the type of authority Ms. Kendrell gave to settle her case against the Government. In general, there are three types of authority: (1) express authority; (2) apparent authority; (3) implied authority. *See Tiernan*, 923 F.2d at 1036. Under Pennsylvania law, an attorney must have "express authority in order to bind a client to a settlement agreement." *Reutzel v. Douglas*, 870 A.2d 787, 790 (Pa. 2005) (citing *Rizzo v. Haines*, 555 A.2d 58 (Pa. 1989); *Senyshyn v. Karlak*, 299 A.2d 294 (Pa. 1973); *Starling v. West Erie Ave. Bldg. & Loan Ass'n*, 3 A.2d 387 (Pa. 1939); *McLaughlin v. Monaghan*, 138 A. 79 (Pa. 1927)). "The rationale for this rule stems from the fact that parties settling legal disputes forfeit substantial legal rights, and such rights should only be forfeited *knowingly*." *Id.* (emphasis added) (citing *Starling*, 3 A.2d at 388). Express authority exists where the client "minutely specifies" what tasks the attorney can perform. *See* Restatement (Second) of Agency § 7 (1958).

In the present case, it is undisputed that Ms. Kendrell gave express authority for Mr. DiJiacomo to settle her case under the terms laid out in his October 17, 2017 email. There, Mr. DiJiacomo confirmed that he would begin settlement negotiations "to obtain the *best possible settlement* in [Mr. DiJiacomo and Mr. Weisberg's] professional *judgment that would include a provision* requiring [the Government]" to enact certain changes, including placing appropriate signage. Tr. 5/15/2018, 16 (emphasis added). Subsequently, Mr. DiJiacomo and Mr. Weisberg

8

claim Ms. Kendrell's authorization had changed or evolved over the course of their representation. Ms. Kendrell, on the other hand, insists she did not grant them "blanket authority" to settle the case. The question before this Court is: what was the scope of authority that Mr. DiJiacomo and Mr. Weisberg had when they entered into the Settlement Agreement on February 22, 2018?

The Government argues that Ms. Kendrell first changed her authority by withdrawing it in her November 18 and 20, 2017 emails to Mr. DiJiacomo. *See* Findings of Fact, *supra* ¶¶ 7–8. On November 13, 2017, Mr. DiJiacomo emailed Ms. Kendrell confirming the parameters of her settlement authorization, which along with the previously discussed injunctive relief also included $5,000 in attorney's fees. Findings of Fact, *supra* ¶ 6. In her November 18th email, Ms. Kendrell rejected a settlement offer provided by Mr. DiJiacomo for $25,000 on the grounds that, although she had agreed to seek monetary damages, she was primarily focused on obtaining "changes" and requiring the Government to help people with disabilities. Gov't Ex. 4, at 2. Ms. Kendrell reiterated her disagreement with Mr. DiJiacomo's offer in her November 20th email and informed him that she would no longer work with him and wished to speak with Mr. Weisberg. Gov't Ex. 4, at 5.

At the hearing, the Government attempted to frame the November 18th email as a response to Mr. DiJiacomo's November 13th email via the following line of questioning between AUSA Reid and Mr. DiJiacomo:

> Q: If you could flip to page two of Government Exhibit 4, do you see Ms. Kendrell's response on page two . . . ?
>
> A: Yes.
>
> Q: What date is that response?

9

| | A: | That date is November 18, 2017, five days after the email up front. |
|---|---|---|
| | Q: | The [November 13, 2017] email confirming authorization? |
| | A: | Yes, sir. |

Tr. 5/15/2018, 25–26.

However, we are not convinced that Ms. Kendrell's November 18 and 20, 2017 emails are in direct response to Mr. DiJiacomo's November 13, 2017 email. Mr. DiJiacomo's email is not a proposed offer, but rather a confirmation of settlement parameters Ms. Kendrell had provided on or about that same day. *See* Gov't Ex. 4, at 1. Likewise, Ms. Kendrell's November 18, 2017 email is rejecting an offer for $25,000 — an offer that is not found in Mr. DiJiacomo's email. *Id.* at 2. Additionally, upon review of Government Exhibit 4, it appears there was at least one additional, intermediate response from Ms. Kendrell to Mr. DiJiacomo, dated November 14, 2017. *Id.* However, the Government entered only a partial reproduction of that email into the record. Finally, we do not interpret either of Ms. Kendrell's emails as withdrawing her settlement parameters and they may, in fact, be more appropriately construed as strengthening them, considering she rejected a $25,000 settlement because it did not include her desired "changes."[2]

Following this November email exchange, Ms. Kendrell had at least one meeting with Mr. Weisberg regarding her case. *See* Findings of Fact, *supra* ¶ 9. According to the Government's witnesses, during one of these meetings or sometime before February 22, 2018, Ms. Kendrell informed Mr. Weisberg and Mr. DiJiacomo that the "changes" were no longer important to her and need not be included in her settlement with the government. However,

---

[2] Though Ms. Kendrell says she "will only accept [the offer] if I don't have another choice," we do not understand that to be an acceptance of the offer. In fact, Mr. DiJiacomo testified that he believed she was revoking her settlement authorization. Tr. 5/15/2018, 28.

there is no direct testimony to support this argument. Mr. DiJiacomo testified that he was not present at the meeting between Mr. Weisberg and Ms. Kendrell, but that "[d]uring that meeting . . . settlement [authority] was changed because Ms. Kendrell did not believe signage was meaningful anymore. At that meeting, instead, . . . authorization was given to attempt any increased monetary settlement, and that's it." Tr. 5/15/2018, 29–30. However, Mr. Weisberg testified that it was Mr. DiJiacomo who had told him "that Ms. Kendrell's position was essentially ever-evolving in terms of signage, in terms of no signage" and other settlement parameters. *Id.* at 43. Both of these statements constitute hearsay testimony and are not admissible. *See* Fed. R. Evid. 801(c), 802.

On February 22, 2018, Mr. Weisberg initiated an email conversation with Ms. Kendrell regarding the instant lawsuit, as well as a separate legal malpractice matter that Weisberg Law was also handling. Tr. 5/15/2018, 45–46; Gov't Ex. 6, at 1. In his email, Mr. Weisberg asked permission to withdraw the legal malpractice matter and confirmed that Ms. Kendrell had "granted [Mr. DiJiacomo] authority to settle your discrimination matter for the best we could achieve for you, if anything (which we believed to be [$5,000])." Gov't Ex. 6, at 1.

Ms. Kendrell responded shortly thereafter, saying, "That's fine . . . . That's the main thing I always wanted: them [held] accountable for the lack of [reasonable accommodations]. I appreciate [your] time and effort, and will pursue it through OPM as soon as [you] tell me I can." *Id.* After a brief exchange, Ms. Kendrell continued in a separate email, "OK, I will send the info to OPM and make sure there will be changes, then it's over and I am relieved . . . ." *Id.* at 2.

Similarly, on February 26, 2018, Mr. DiJiacomo emailed Ms. Kendrell to confirm authorization to settle the case. Tr. 5/15/2018, 23–33; Gov't Ex. 5. Ms. Kendrell responded, "Yes [I] agree to settle with the offer you feel is best, [h]owever [I] still think they should do

more so more people can be helped. [I] will go forward in another matter to [e]nsure they do as they are required to do for the [disabled personnel] in government . . . ." Findings of Fact, *supra* ¶ 14.

Mr. Weisberg and Mr. DiJiacomo testified that they interpreted Ms. Kendrell's responses to mean Ms. Kendrell had confirmed they had "blanket authority" to settle the case with no other conditions. Tr. 5/15/2018, 33, 46–47. We disagree. First, in each of Ms. Kendrell's replies she explains that she plans to continue to seek changes through OPM. Gov't Ex. 6, at 1–2. It is apparent that Ms. Kendrell did not believe that any settlement agreement Mr. Weisberg would agree to would preclude her from continuing to pursue this issue. Express authority is designed to ensure that the client *knows* what rights she is giving up by settling her case. *See Reutzel*, 870 A.2d at 790. Ms. Kendrell could not grant Mr. Weisberg such express authority to restrict her ability to seek changes in a settlement agreement while clearly still planning on going through OPM.

Second, it is reasonable that Ms. Kendrell understood Mr. Weisberg's phrase, "the best we [Mr. Weisberg and Mr. DiJiacomo] could achieve for you," to include changes. Mr. DiJiacomo's initial October 2017 email to Ms. Kendrell confirmed that changes were included in what would be considered the "best possible settlement." Gov't Ex. 1. Ms. Kendrell was consistent in her desire to seek changes in each of her communications with Mr. Weisberg and Mr. DiJiacomo. *See, e.g.*, Findings of Fact, *supra* ¶ 7 ("When you asked me if I would accept $25,000 or changes, of the two, I said changes."); ¶ 11 ("That's the main thing [I] always wanted[, for] them [to be held] accountable for the lack of [reasonable accommodations given to Anthony Kendrell]. [I] will pursue it through OPM as soon as [you] tell me [I] can."); ¶ 14 ("[I] still think they should do more so more people can be helped. [I] will go forward in another

matter to [e]nsure they do as they are required to do for the [disabled personnel] in government . . . .").

There is no evidence that Ms. Kendrell had, at any point, agreed or acknowledged that "the best we could achieve for you" would no longer include "changes," either in the agreement itself or through pursing the matter with OPM. Mr. DiJiacomo even testified that Ms. Kendrell had always imposed settlement parameters:

> Q: Now, [Ms. Kendrell's desire for changes and to go through OPM] was communicated in November [2017], but had the position changed in terms of your authority to settle this case?
>
> A: No. At all times when I had conversations up until [the February 26, 2018 conversation with Ms. Kendrell], I was always told that I had authorization to settle.
>
> Q: Okay. And were you given specific guidelines?
>
> A: Yes, as reflected in the emails, typically some type of signage and monetary value to cover our attorney fees.

Tr. 5/15/2018, 34–35.

Ms. Kendrell reiterated this point,

> [E]very time I spoke to [Mr. DiJiacomo], I told him I would only sign [a settlement agreement] if they did what was in [the settlement parameters] and if I could go and have an investigation with OPM. If I could not do that, I offered to pay them the [retainer fee] and not settle and go on my own to OPM. I don't understand how he would think — the settlement he sent me was so far off [from] the one I thought was on the table — [that] he told me was on the table.

*Id.* at 64.

It is clear that Ms. Kendrell was unaware of what was in the Settlement Agreement. On March 4, 2018, before she had received the finalized Settlement Agreement, she emailed

13

Mr. Weisberg thanking him and his associates for their help. *See* Findings of Fact, *supra* ¶ 15. In her email, she said,

> I want to send anything that will help the disabled in government get what they need to perform. I am sending the info to anyone it can help. My only object is to have as many peoples' lives get better because of Anthony's death. *Had there been a money settlement it all would go to help peoples' lives.* I don't want or need anything in that way.

Gov't Ex. 6, at 7 (emphasis added). Clearly, Ms. Kendrell was unaware that money was even apart of the Settlement Agreement.

For these reasons, it is clear Ms. Kendrell did not grant express authority for Mr. Weisberg to enter into this Settlement Agreement. At no point did she knowingly grant permission to settle this case for anything other than her initial settlement parameters, which included "changes" or the ability to go to OPM. We find that no valid settlement agreement has been reached and the Government cannot enforce settlement.

## IV. CONCLUSION

Accordingly, the Government's Motion to Enforce Settlement Agreement is denied.

An appropriate Order follows.