# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IRENE KENDRELL, personal representative of the ESTATE OF ANTHONY KENDRELL, | CIVIL ACTION |
| Plaintiff, | No. 17-229 |
| v. | |
| JIM MATTIS, Secretary of the U.S. Department of Defense, | |
| Defendant. | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                                 **NOVEMBER 5, 2018**

Plaintiff Irene Kendrell ("Kendrell") filed this action as the Personal Representative of the Estate of Anthony Kendrell (the "Estate" or "Anthony") against Defendant Jim Mattis, the Secretary of the United States Department of Defense ("Government"), alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* and the New Jersey Law against Discrimination, N.J. Stat. Ann. §§ 10:5–12. By stipulation, the New Jersey Law against Discrimination claim was dismissed and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, was substituted in place of Kendrell's ADA claims. (Doc. No. 11.)

On or around September 21, 2016, Kendrell filed a Complaint on behalf of the Estate of her son, Anthony, in the United States District Court for the District of New Jersey.[1] (Doc. No.

---

[1] Kendrell was originally represented by counsel. However, on April 25, 2018, the Court allowed counsel to withdraw from the case. (Doc. No. 21.) An evidentiary hearing was held on April 25, 2018 to determine whether Kendrell could proceed on behalf of the Estate without the assistance of counsel. Federal law permits a party to pursue all relief available to her without representation of counsel, but a non-attorney party may not seek relief on behalf of anyone other than herself. *See Johnson v. Marberry*, 549 F. App'x 73, 75 (3d Cir. 2013) (citing 28 U.S.C. § 1654). Estate administrators do not act on behalf of themselves, but rather on behalf of the estate beneficiaries. However, a non-attorney estate administrator may proceed *pro se* if she is the sole beneficiary of the estate. *See*

1-1.) On January 13, 2017, the case was transferred to this Court. (Doc. No. 1-7.) In her Complaint, Kendrell alleges that the Government: (1) failed to provide reasonable accommodations for Anthony's disability; (2) subjected Anthony to a hostile work environment because of his disability; and (3) unlawfully retaliated against Anthony.[2] (Compl. ¶¶ 33–42.)

Presently before the Court is the Government's Motion for Summary Judgment (Doc. No. 40) and Kendrell's *pro se* Motion for Case to Go to Trial with a Jury (Doc. No. 41). On October 19, 2018, a hearing was held to discuss these motions.[3] For the reasons noted below, the Government's Motion is granted and Kendrell's *pro se* Motion for Case to Go to Trial with a Jury is denied.

## I.  **BACKGROUND**[4]

Anthony experienced Asperger's Syndrome and High Functioning Autism. (Def.'s Mem. Law Supp. 2, Ex. A ("EEO Compl."), at 4.) Beginning in 2008, Anthony worked as a Contract Specialist for the Defense Logistics Agency ("DLA"). (*Id.*) Anthony was assigned to "first line supervisor," Donna Raday ("Raday"), and "second line supervisor," Ruth Herman ("Herman"). (Compl. ¶ 12.) Both Raday and Herman were aware that Anthony suffered from a mental disability and that, in order to accommodate him, they were required to: (1) explain new duties to

---

*Malone v. Nielson*, 474 F.3d 934, 936–37 (7th Cir. 2007) (per curiam). Here, Kendrell is the sole beneficiary of the Estate. Consequently, we found that Kendrell could proceed in this matter *pro se*. (Doc. No. 26.)

[2] At some point during the proceedings, an apparent settlement was reached between the Government and counsel for Kendrell. The Court granted the Government's Motion to Enforce Settlement Agreement on April 17, 2018 and marked the case closed. (Doc. No. 17.) However, after a *pro se* Emergency Motion to Request a Hearing on Motion to Enforce Settlement Agreement, filed by Kendrell on April 19, 2018, as well as an evidentiary hearing on April 25, 2018, it was apparent that Kendrell had not authorized the settlement and wished to proceed with the case. (Doc. Nos. 18, 19.) On June 19, 2018, the Court vacated its earlier decision, denied the Government's Motion to Enforce Settlement Agreement, and reopened the case. (Doc. No. 27.)

[3] At the hearing, it was decided that Kendrell's *pro se* Motion for Case to Go to Trial with a Jury would be construed as her Response in Opposition to the Government's Motion.

[4] Kendrell's Motion does not contain a detailed description of the facts at issue in this case. Therefore, we rely on the facts presented in her Complaint (Doc. No. 1-1.), as well as the Government's Motion for Summary Judgment. *See Holmes v. Chiarelli*, No. 4:07-1477, 2010 WL 4781103, at *11–12 (M.D. Pa. Nov. 17, 2010).

Anthony in discreet, manageable tasks; (2) provide opportunities for Anthony to ask specific questions concerning his tasks in person; (3) provide new assignments to Anthony in discreet, manageable amounts; (4) provide validation to Anthony before providing constructive feedback; and (5) provide reiteration of new task instructions when needed. (*Id.* ¶¶ 12–13.)

However, Kendrell asserts that Raday and Herman did not accept Anthony's mental disability as a valid disability requiring reasonable accommodations. (*Id.* ¶ 14.) According to Kendrell, Raday refused to provide Anthony any reasonable accommodations and would "dump" multiple assignments on Anthony's desk without providing manageable instructions or being available to answer any of Anthony's questions in person. (*Id.* ¶ 15.) Raday would also subject Anthony to sarcasm and cynicism, thus amplifying Anthony's symptoms. (*Id.*)

In or around the summer of 2009, Anthony requested to be assigned to a new supervisor. (*Id.* ¶ 16.) Before working for Raday, Anthony had successfully worked as a contract specialist under prior supervisors. (*Id.*) However, Raday frequently worked from home and was largely unavailable to answer Anthony's questions in person. (*Id.* ¶ 20.) Raday was aware of Anthony's need to ask in-person questions and have instructions reiterated multiple times; however, she required Anthony to send her questions via email that she would respond to days later. (*Id.*) Anthony's request for a new supervisor was denied. (*Id.*)

In May 2013, Anthony was assigned oversight of the Decentralized Blanket Purchase Agreement Program ("Program").[5] (Def.'s Mem. Law Supp. 2.) He was initially trained in his new role for three hours by Linda Ciglinsky ("Ciglinsky"). (Compl. ¶ 19.) However, after this initial training, Raday took over as his trainer. (*Id.*) Anthony asked to continue training with Ciglinsky, but Raday refused, saying that he could ask her questions via email. (*Id.* ¶ 20.)

---

[5] The Program requires contract specialists, such as Anthony, to draft contract announcements, bids, and proposals; evaluate contract proposals; and recommend contract awards. (Def.'s Mem. Law Supp. 2.)

3

On June 24, 2013, Anthony filed a complaint with DLA's Equal Employment Opportunity Office ("EEO"), alleging that DLA failed to provide him reasonable accommodations and subjected him to disability-based harassment. (*Id.* ¶ 22; *see also* Def.'s Mem. Law Supp. 3.) In his EEO Complaint, Anthony requested again to be placed under different supervisors. (*See* Def.'s Mem. Law Supp. 3.) Kendrell alleges that, in response to Anthony's EEO Complaint, Raday moved Anthony's desk away from his fellow contract specialist colleagues and placed him outside of her office. (*See* Compl. ¶ 24.)

However, despite his relocation away from his colleagues, Raday purportedly instructed Anthony to direct any questions that he had to his colleagues near the area where he previously worked. (*See id.* ¶ 25.) Anthony was uncomfortable asking his colleagues for assistance because of his disability and asked Raday to introduce him to them and explain that he would be seeking assistance from time to time. (*Id.*) Raday refused, stating, "I don't have time to be running around." (*Id.*)

On November, 27, 2013, Herman sent a "Letter of Concern and Instruction" to Anthony, which explained that his "requests for assistance with basic contract concepts" were troubling and that he "repeatedly ask[ed] the same basic questions" and had "difficulty performing basic, repeated tasks." (*Id.* ¶ 27.) The letter was not disciplinary and was not placed in Anthony's personnel file. (*See* Def.'s Mem. Law Supp., Ex. E ("Herman Dep."), 16:9–16:19.)

On February 19, 2014, DLA placed Anthony on indefinite, paid administrative leave pending medical documentation that he was not a threat to himself or others as a result of an incident that occurred a few days earlier. (*See id.*) According to a letter from Herman to Anthony concerning the administrative leave, Anthony was "irate and loud" and angry about Raday. (Compl., Ex. 4 ("Administrative Letter").) The letter further continued:

> You [Anthony] repeated that you were stressed, and then told me that you were thinking of killing yourself. You said that you thought about it every night since you were 11 years old, and that you wished you were dead. You expressed it in a stream of consciousness manner, also saying "that I wouldn't kill myself because I didn't want to spend eternity in purgatory; I'd rather live in hell on earth than hell in purgatory. I'm a logical person."

(*Id.* at 1; *see also* Herman Dep., 32:2–32:24.)

Anthony remained on paid administrative leave until May 19, 2015, at which time DLA removed him from federal service. (Def.'s Mem. Law Supp. 4–5.) Anthony was unable to provide medical documentation that showed he was medically able to return to work or clarify conflicting documentation provided by his treating physician, Dr. Leon I. Rosenberg. (Def.'s Mem. Law Supp., Ex. I ("Notice of Decision").) On May 23, 2015, Anthony took his own life. (Compl. ¶ 30.)

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could

5

return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting *Liberty Lobby*, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. *Tziatzios v. United States*, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines there are no genuine disputes of material fact, then summary judgment will be granted. *Celotex*, 477 U.S. at 322.

"Although *pro se* filings are entitled to liberal construction, the plaintiff must still set forth facts sufficient to survive summary judgment." *Houseknecht v. Doe*, 653 F. Supp. 2d 547, 555 (E.D. Pa. 2009). "When considering a motion in a *pro se* plaintiff's proceedings, a court must 'apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name.'" *Dawson v. Cook*, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017) (quoting *Holley v. Dep't of Veteran Affairs*, 165 F.3d 244, 247–48 (3d Cir. 1999)); *see also Hamilton v. Jamieson*, 355 F. Supp. 290, 298 (E.D. Pa. 1973). However, the Court may not "infer facts or legal arguments central to plaintiff's claims which are not set forth in plaintiff's . . . Complaint." *Lumumba v. Phila. Dep't of Human Servs.*, No. 98-5195, 1999 WL 345501, at *2 (E.D. Pa. May 21, 1999).

## III. DISCUSSION

The Rehabilitation Act "expressly makes the standards set forth in the [ADA] applicable to federal employers and to employers receiving federal funding." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Kendrell brings three claims against the Government: (1) failure to provide reasonable accommodations for Anthony's disability; (2) hostile work environment because of his disability; and (3) unlawful retaliation against Anthony. (Compl. ¶¶ 33–42.) We will address each claim in turn.

### A. DLA did not Fail to Provide Reasonable Accommodations

"An employer discriminates against a qualified individual with a disability when the employer does not make reasonable accommodations to the known physical or mental limitations of the individual . . . ." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). "When making an accommodation claim, '[a]n employee can succeed under the Rehabilitation Act only if the employee can demonstrate that a specific, reasonable accommodation would have allowed [him] to perform the essential functions of [his] job.'" *Boandl v. Geithner*, 752 F. Supp. 2d 540, 558 (E.D. Pa. 2010) (quoting *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 232 (3d Cir. 2000)). "The plaintiff must make a prima facie showing that reasonable accommodation is possible. If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer." *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996).

Kendrell alleges that Anthony was not given a reasonable accommodation that would have allowed him to perform the essential functions of his job. (Compl. ¶¶ 33–36.) In her Complaint and supplemental documents, Kendrell identifies only one accommodation that

7

Anthony sought: to be reassigned to a different supervisor.[6] (*See, e.g.*, Compl. ¶¶ 16, 21 ("Kendrell requested that Ciglinksy be reassigned as his trainer."); Compl. ¶ 22 ("In the [DLA EEO Complaint], Kendrell simply requested a different supervisor.").  However, the United States Court of Appeals for the Third Circuit ("Third Circuit") is clear that transfers away from coworkers or managers do not constitute reasonable accommodations. *See Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3d Cir. 1998) (quoting *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 384 (2d Cir. 1996)) (holding that Congress did not enact the ADA to allow courts to "interfere with personnel decisions," but simply intended that "disabled persons have the same opportunities available to them as are available to nondisabled persons."); *see also Ozlek v. Potter*, 259 F. App'x 417, 421 n.2 (3d Cir. 2007) (extending *Gaul* to encompass transfers away from supervisors and managers as unreasonable accommodations).

According to the Third Circuit, employee transfer requests place a "wholly impractical obligation on . . . any employer." *See Gaul*, 134 F.3d at 581.  Employers would face an "amorphous 'standard'" that obligated them to transfer employees depending on an "infinite number of variables, few of which are under [their] control." *Id.*  Additionally, employers would be subjected to "extraordinary administrative burdens" when "assigning new projects . . . , changing work locations, or planning social events." *Id.*  Employers would be effectively turning over their managerial functions to the courts. *See id.*

---

[6] It is unclear whether Kendrell includes a claim for reasonable accommodation regarding Anthony's need for opportunities to ask questions concerning his tasks in-person and be provided reiteration of new task instructions when needed.  To the extent such a claim is brought, we find that it also fails. (Compl. ¶ 28.) Kendrell alleges that Raday was unavailable to Anthony because she frequently worked from home (which is one of the reasons Anthony requested a new supervisor). (*Id.* ¶ 20.)  We do not find that requiring Raday to be in the office every day to answer Anthony's questions a reasonable accommodation. *See* ADA Compliance Guide, Types of Reasonable Accommodations ¶ 350 (2018) (noting reasonable accommodations include accommodations involving only the member of the protected class).  Furthermore, the employee is not entitled to the specific accommodation he desires. *See Nicastro v. Bair*, E.E.O.C. Dec. 0120070531, 2008 WL 4287685, *2 (E.E.O.C. September 12, 2008) (citing *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act*, at Question 7 (October 17, 2002)).  DLA did provide Anthony with a reasonable accommodation: Anthony was instructed to ask his fellow co-workers for assistance. (Compl. ¶¶ 25–26.)

8

Anthony's accommodation request to be transferred to a different supervisor is a legally insufficient accommodation and cannot sustain Kendrell's reasonable accommodation claim.[7] Accordingly, summary judgment is granted and the claim is dismissed.

### B. Anthony was not Subjected to a Hostile Work Environment

To establish a prima facie case of hostile work environment under the Rehabilitation Act, an employee must prove that: (1) he suffered intentional discrimination because of a disability; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person of the same protected class; and (5) that *respondeat superior* liability applied. *See Boandl*, 752 F. Supp. 2d at 571. Due to the difficulty in determining the motivations of an action, "a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999).

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,'" such that it alters the conditions of employment and creates an abusive working environment, the "severe or pervasive" prong is met. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca*

---

[7] Kendrell also argues that DLA failed to engage in the "interactive process" of developing an adequate reasonable accommodation. *See Solomon v. Sch. Dist. of Phila.*, 882 F. Supp. 2d 766, 778 (E.D. Pa. 2012) (citing *Williams v. Phila. Housing Auth. Police Dep't.*, 380 F.3d 751, 761 (3d Cir. 2004) ("'Adverse employment decisions . . . include refusing to make reasonable accommodations for a plaintiff's disabilities,' where 'reasonable accommodation' include 'the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith.'"); *Mengine v. Runyon*, 114 F.3d 415, 416 (3d Cir. 1997)). An employee can show a failure to engage by demonstrating: "(1) 'the employer knew about the employee's disability'; (2) 'the employee requested accommodations or assistance for his or her disability'; (3) 'the employer did not make a good faith effort to assist the employee in seeking accommodations'; and (4) 'the employee could have been reasonable accommodated but for the employer's lack of good faith.'" *Mills v. Temple Univ.*, 869 F. Supp. 2d 609, 622 (E.D. Pa. 2012) (quoting *Taylor*, 184 F.3d at 319–20). However, because Kendrell "cannot demonstrate reasonable accommodation, [DLA's] lack of investigation in to reasonable accommodation is unimportant." *Solomon*, 882 F. Supp. 2d at 779 (quoting *Donahue*, 224 F.3d at 233).

*Raton*, 524 U.S. 775, 788 (1998); *see also Mufti v. Aarsand & Co.*, 667 F. Supp. 2d 535, 545 (W.D. Pa. 2009). "To determine whether discrimination is sufficiently hostile to create employer liability, a reviewing court must look at the totality of the circumstances, including factors such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance.'" *Boandl*, 752 F. Supp. 2d at 571 (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001)). The court is not required to cobble together unsubstantiated theories from otherwise innocuous facts. *See Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005).

Kendrell alleges that Anthony was harassed based on his mental disability, which created both an objective and subjective hostile environment. (Compl. ¶ 31.) Although Kendrell's Response in Opposition does not contain a specific argument to establish a prima facie case of hostile work environment, the Government identified and addressed the following four potential arguments from the Complaint: (1) "Raday would regularly provide instructions on new tasks in an abrupt, off the cuff way," (*see id.* ¶ 17); (2) "Raday continuously subjected [Anthony] to unnecessary criticism, sarcasm, and cynicism because of [Anthony's] mental disability, (*see id.*); (3) Raday allegedly told Anthony in response to a question, "I don't have time to be running around," (*see id.* ¶ 25);[8] and (4) Herman allegedly told Anthony that "she was tired of hearing Asperger's Syndrome as an excuse," (*see id.* ¶ 14). (*See* Def.'s Mem. Law Supp. 22.) We agree with the Government's proposed potential arguments for claims of hostile work environment contained in Kendrell's Response and also find that nothing asserted in the Complaint or

---

[8] After Raday instructed Anthony to ask one of his co-workers if he had questions or needed help, Anthony asked her to introduce him to them. Raday allegedly responded, "I don't have time to be running around." (Compl. ¶ 25.)

10

evidenced in the supplemental documents provided by Kendrell amounts to a hostile work environment.

Kendrell cannot defeat summary judgment by relying on the allegations in the Complaint alone. *See Holmes*, 2010 WL 4781103, at *11–12. Nevertheless, her arguments are legally insufficient or do not rise to the level of "severe or pervasive." *See Harris*, 510 U.S. at 23. Offhanded comments, such as Herman's alleged statement that she was tired of hearing Anthony's disability as an excuse, typically do not create a hostile work environment. *See Mufti*, 667 F. Supp. 2d at 545. According to the Complaint, this comment was made once and the timing of it is unclear. (Compl. ¶14.) Therefore, we do not consider this comment severe or pervasive.

Likewise, the fact that a supervisor gave "abrupt, off the cuff" project instructions or was overly critical, sarcastic, or cynical, as Kendrell claims Raday was to Anthony, "does not alone evidence a hostile work environment." *Fusco v. Bucks Cty. of Pa.*, No. 08-2082, 2009 WL 4911938, at *10 (E.D. Pa. Dec. 18, 2009). Furthermore, the evidence provided by Kendrell does not support the argument that Raday acted this way towards Anthony *specifically* because of his disability. *See Boandl*, 752 F. Supp. 2d at 571. According to Anthony, other co-workers were unhappy with the workplace environment.[9] (Doc. No. 45, Attachments, p. 2 (In what appears to be Anthony's written comments to an Agreement of Expectations, he writes, "Donna Radar's [sic] instructions are very fast and vague. *Others agree with me on this.*" (emphasis added)).) Since Kendrell is unable to demonstrate that Raday's treatment of Anthony was different than

---

[9] Kendrell's Response in Opposition consists of unarranged documents and duplicates. One set of documents was attached to Kendrell's *pro se* Motion for Case to Go to Trial with a Jury (Doc. No. 41), while another set was handed to the Court at the October 19 hearing (Doc. No. 45). These documents have been filed under seal. For purposes of clarity, the documents will be identified here by the order in which they appear in the original filing.

Many of these documents are partial reproductions or unverified as to their source. However, despite potential evidentiary challenges, we grant them a modicum of weight in order to better understand Kendrell's arguments. *See Houseknecht*, 653 F. Supp. 2d at 555 (allowing for a liberal interpretation of *pro se* filings).

her treatment of other employees, she fails to establish that Raday singled-out Anthony because of his disability. *See Gordon v. City of N.Y.*, 612 F. App'x 629, 631 (2d Cir. 2015) (quoting *Brown v. Henderson*, 257 F.3d 246, 254 (2d Cir. 2001)) ("[I]n the absence of evidence suggesting that a plaintiff's sex was relevant, the fact that both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex."); *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 262 (4th Cir. 2001) (citing *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir. 2000)); *Robinson v. Hyatt Corp.*, No. 07-3682, 2009 WL 2194639, *8 (D.N.J. July 23, 2009) (considering similar treatment of plaintiff and coworkers to deny hostile work environment claim).

Finally, Raday's alleged response to Anthony that she didn't "have time to be running around" introducing him to his co-workers was clearly not offensive. *See Faragher*, 524 U.S. at 788 (holding that the "general civility code" will "filter out complaints attacking 'the ordinary tribulations of the workplace'"). This single incident cannot be used to as a basis for a hostile work environment claim. *See id.*

Based on the totality of the circumstances, Kendrell fails to establish a prima facie case of hostile work environment. Accordingly, summary judgment is granted and the claim is dismissed.

### C. DLA did not Retaliate against Anthony

#### 1. Kendrell Failed to Exhaust Her Retaliation Claim

"A federal employee seeking relief under the Rehabilitation Act must exhaust administrative remedies prior to filing suit." *Cave v. Potter*, No. 10-2577, 2011 WL 4101501, at *3 (E.D. Pa. Sept. 9, 2011) (quoting *Campbell v. United States*, 75 F. App'x 254, 258 (3d Cir. 2010)) (citing *Freed v. Consol. Rail Corp.*, 201 F.3d 188, 191 (3d Cir. 2000)). As a general rule,

an employee cannot bring claims, in a civil lawsuit, that were not included in their Equal Employment Opportunity Commission ("EEOC") charge. *See Gonzalez v. Potter*, No. 09-0534, 2010 WL 2196287, at *2 (W.D. Pa. June 1, 2010) (citing *Rogan v. Giant Eagle, Inc.*, 113 F. Supp. 2d 777, 787 (W.D. Pa. 2000)); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir. 1996) (citing *King v. Seaboard Coast Line R.R.*, 538 F.2d 581, 583 (4th Cir. 1976)) ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint.").

A failure to exhaust administrative remedies is fatal to a claim of employment discrimination. *See Cave*, 2011 WL 4101501, at *4 (citing *Wadhwa v. Sec'y Dep't of Veterans Affairs*, 396 F. App'x 881, 885 (3d Cir. 2010)). The Third Circuit has held that the failure to exhaust administrative remedies may result in the dismissal of a complaint. *See id.* The United States Supreme Court emphasizes the procedural hurdles to federal court review are strictly construed and "are not to be disregarded . . . out of a vague sympathy for particular litigants." *Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984).

Here, Anthony's EEO complaint did not contain an allegation of retaliation by the Government. (*See* EEO Compl.) Additionally, the Final Agency Decision from the DLA's EEO did not address retaliation. (*See id.*, Ex. D ("Final Agency Decision") (citing analysis of discrimination and harassment on the basis of a mental disability).) Retaliation was raised for the first time in Kendrell's Complaint. (*See* Compl. ¶¶ 37–39.)

Therefore, because Kendrell did not fully exhaust the administrative remedies for her retaliation claim, the claim is untimely. Summary judgment is granted and the claim is dismissed.

### 2. Kendrell's Retaliation Claim Fails under the *McDonnell Douglas* Analysis

Even though Kendrell's retaliation claim is untimely, it also fails on the merits. Retaliation claims brought under the Rehabilitation Act are governed pursuant to the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under this framework, [the plaintiff] has the initial burden to make a prima facie case of discrimination." *Simon v. Potter*, 328 F. App'x 143, 147 (3d Cir. 2009).

> To establish a prima facie case of retaliation under the [Rehabilitation Act], a plaintiff must initially show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."

*Boandl*, 752 F. Supp. 2d at 561 (alteration in original) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).

Once the employee establishes a prima facie case, the employer must "articulate some legitimate, nondiscriminatory reason for the employment action." *Wishkin*, 476 F.3d at 185. If successful, the presumption of discriminatory action raised by the employee is rebutted. *See id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)). The burden then shifts back to the employee to show that the employer's "stated reason for the [adverse] employment action, such as plaintiff's rejection or separation, was pretextual." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804). To prove pretext, the employee must "cast [] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication . . . or . . . allow[] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse

employment action." *Id.* at 185 (alterations in original) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994)). Thus, an employee who has made a prima facie case of discrimination "may defeat a motion for summary judgment by either '([1]) discrediting the employer's proffered reasons, either circumstantially or directly, or ([2]) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Id.*

Here, Kendrell fails to establish a prima facie case of retaliation. For purposes of this motion, it is uncontested that Anthony engaged in protected activity by filing his EEO Complaint. (*See* Def.'s Mem. Law Supp. 14.) However, because the complaint did not allege retaliation, we assume the retaliation claim is based on Raday moving Anthony's desk nearer to her office and his placement on administrative leave. (*See id.*)

The Government argues that there is no causal connection between the protected activity and the alleged adverse actions. (*See id.* at 15.) To establish a causal connection, Kendrell must show either "(1) a temporal proximity between the two events that is "unusually suggestive" of retaliation, or (2) timing plus other evidence, such as evidence that [DLA] engaged in a 'pattern of antagonism' with [Anthony]." *See Boandl* 752 F. Supp. 2d at 562.

Anthony filed his EEO Complaint on June 24, 2013. (*See* Final Agency Decision, 2.) No date is given for when DLA moved Anthony's desk. (*See* Compl. ¶ 24.) Herman sent her Letter of Concern on November 27, 2013, and Anthony was placed on administrative leave on February 19, 2014. (*See* Def.'s Mem. Law Supp. Exs. F ("Letter of Concern"), G ("Placement on Administrative Leave Memorandum").) Anthony was informed of his termination on May 19, 2015. (Notice of Decision 1.)

None of these actions are "unusually suggestive" of retaliation. *See Luckiewicz v. Potter*, 670 F. Supp. 2d 400, 412 (E.D. Pa. 2009) (time periods of two months, without additional evidence, are not "unnecessarily suggestive" to demonstrate causation); *Wascho v. Fed. Express Corp.*, 402 F. Supp. 2d 547, 560 (E.D. Pa. 2005) (finding five months too distant); *compare Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (holding that two days between protected activity and an adverse action was "unusually suggestive" of retaliatory motive), *with Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (three weeks between complaint and termination letter not "unusually suggestive"). All of these purported retaliatory adverse actions occurred several months or years after Anthony filed his EEO Complaint. Therefore, Kendrell cannot establish an "unusually suggestive" temporal proximity between Anthony's protected activity and the alleged retaliation.

Likewise, Kendrell offers no evidence of retaliatory animus. The only allegations that could amount to a "pattern of antagonism" are Raday's allegedly "abrupt, off the cuff" instructions, her unnecessary criticism of Anthony, and her comment declining to introduce Anthony to his fellow co-workers. These allegations were addressed in Kendrell's hostile work environment claim. *See* Hostile Work Environment Claim, *supra* Section III-B. Since we have already addressed these allegations, we need not do so again here. As we found above, these claims do not rise to the level of a "pattern of antagonism." *See id.*

However, even if Kendrell could establish a prima facie case, the Government offers several legitimate, nondiscriminatory reasons for placing Anthony on administrative leave. (*See* Def.'s Mem. Law Supp. 21–22 (citing Letter of Concern; Placement on Administrative Leave Memorandum).) According to a February 19, 2014 letter Anthony received informing him that he was being placed on administrative leave, he had become "visibly upset" and "very angry

16

about . . . current supervisor, Donna Raday." (*See* Placement on Administrative Leave Memorandum 1.)  He said that he had "thought about [killing himself] every night since [he] was 11 years old, and that [he] wished [he] were dead." (*Id.*)  He continued that he "wouldn't kill [him]self because [he] didn't want to spend eternity in purgatory." (*Id.*)  Herman, believing Anthony to be a danger to himself and others in the workplace, required Anthony to undergo a medical evaluation before he could resume his job. (*Id.*)  In order to return to work, Anthony would need to prove that he was medically able to return to duty and safely perform all of his duties and responsibilities and that he no longer posed a threat to himself or others. (*Id.*)  However, after nearly sixteen months on administrative leave, Anthony was unable to provide certain medical documentation from his treating physician that he was cleared to return to work. (*See* Notice of Decision 7.)  Therefore, his position with DLA was terminated. (*See id.* ("Removing [Anthony] will enhance the efficiency of the federal service since the agency will be able to assign [Anthony's] duties to a dependable employee who is able to perform the duties of [Anthony's] position.").)

For these reasons, as well as other, more detailed instances of concern known to DLA management, (*see* Notice of Decision 3–5; *see also* Def.'s Mem. Law Supp., Ex. H ("Notice of Proposed Removal"), 2), the Government has met its burden to prove a legitimate, nondiscriminatory reason for its actions concerning Anthony's employment.

Once the employer is able to show a legitimate, nondiscriminatory reason for its action, the burden shifts back to the employee to prove that the proffered reason was pretextual. *Wishkin*, 476 F.3d at 185.  However, here, Kendrell cannot "cast [] sufficient doubt" to show that a "factfinder could reasonably conclude that each reason was a fabrication" or an inference that "discrimination was more likely than not a . . . determinative cause of the adverse employment

action." *See id.* at 185 (alteration in original) (quoting *Fuentes*, 32 F.3d at 762); *see also Palmquist v. Shinseki*, 689 F.3d 66, 74 (1st Cir. 2012) (applying "but-for" standard from *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–77 (2009), to cases brought under the Rehabilitation Act because of the textual similarity between the Rehabilitation Act and the Age Discrimination in Employment Act).

Accordingly, Kendrell cannot sustain her claims of retaliation under the Rehabilitation Act. Summary judgment is granted and the retaliation claim is dismissed.

### D. Issues Presented by Kendrell in Her Court Filings

Finally, Kendrell's Response in Opposition is not a traditionally formatted legal filing. Rather, it is a combination of documents mixed with her own notes and annotations. Portions of the filing consist of unrelated articles or internet printouts that do not speak to any factual or legal arguments pertaining to the case at bar; however, a few documents and notes are provided that help illustrate Kendrell's argument. In particular, included is a copy, or a partial copy, of a letter signed by Kendrell that states potential arguments concerning hostile work environment and failure to accommodate claims. (Doc. No. 45, Attachments, p. 11.) We will briefly address these now. *See Houseknecht*, 653 F. Supp. 2d at 555 (noting *pro se* filings are subject to liberal construction); *Dawson*, 238 F. Supp. 3d at 717.

Kendrell asks the following questions: (1) "Why was [Herman] allowed to deny Anthony the accommodations he needed as a disabled person under the [ADA]?"; (2) "Why was [Raday] allowed to isolate him and embarrass him?"; (3) "Why wasn't he allowed to go back to work despite obtaining a clearance from Dr. Rosenberg that he could?"; (4) "Why was [Herman] allowed to change the conditions for his return and make them contingent upon working

18

independently, without accommodations, and still working under [Raday]?"; and (5) "Why wasn't he changed to a different supervisor . . . ?" (Doc. No. 45, Attachments, p. 11.)

The first question addresses Anthony's need to be able to ask questions concerning his tasks in person and be provided reiteration of new task instructions when needed. (Compl. ¶ 28.) As we noted above, Anthony wanted to ask Raday questions relating to new projects; however, because she was out of the office frequently, she was not always able to respond in a manner suitable to Anthony. (*See id.* ¶ 20.) In light of this, DLA provided Anthony a reasonable accommodation to ask his co-workers for assistance when needed. (*See id*. ¶ 25.)

The second question concerns the hostile work environment claim. Again, as noted above, there is no evidence that Raday's attitude towards Anthony rose to the level of "severe or pervasive," nor is there evidence that she treated him this way because of his disability. (*See* Hostile Work Environment Claim, *supra* Section III-B.)

The third question does not relate to any claim, specifically; however, it appears to misstate Anthony's condition to return to work. In a medical documentation letter signed by Anthony's treating physician, Dr. Leon Rosenberg, and dated February 10, 2015, Anthony was not medically cleared to return to work. (*See* Notice of Decision 2–3.) Then in Dr. Rosenberg's March 30, 2015 medical documentation letter, he conditionally approved Anthony to return to work if he received reassurances from Anthony's new treating physician, Dr. Emanual Ugwoke, regarding several medically-relevant questions. (*See id.* 1–2.) There is no record that Dr. Ugwoke ever provided any recommendation or documentation concerning Anthony's ability to return to work. (*See id.* 7 ("Dr. Emanual Ugwoke could not provide documentation to the agency regarding you [sic] safety returning to the workplace and recommended that you contact [Dr. Rosenberg].").) Therefore, it does not appear that Anthony properly complied with the

19

conditions of his return, which, as noted above, ultimately led to his termination from DLA. *See McDonnell Douglas* Analysis, *supra* Section III-D.

The fourth and fifth questions relate to Anthony's desired accommodation of transferring to a new supervisor. As we stated, the law does not recognize that a change of supervisor is a valid reasonable accommodation. *See Gaul*, 134 F.3d at 581; (*see also* Reasonable Accommodation Claim, *supra* Section III-A.)

## IV. <u>CONCLUSION</u>

For the reasons noted above, the Government's Motion for Summary Judgment is granted. Accordingly, Kendrell's claims of failure to accommodate, hostile work environment, and retaliation are dismissed. Likewise, Kendrell's *pro se* Motion for Case to Go to Trial with a Jury is denied.

An appropriate Order follows.